UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

_____

MARY DELGADO,                          :
                                       :
        Plaintiff,                     :
                                       :
                                       :   **MEMORANDUM & ORDER**
        v.                             :
                                       :   Civil Action No: 03-6199 (JCL)
                                       :
LA WEIGHT LOSS CENTERS, INC.,          :
                                       :
        Defendant.                     :
                                       :
_____ :

**<u>LIFLAND, District Judge</u>**


Plaintiff Mary Delgado ("Delgado") brings this one-count diversity action against defendant LA Weight Loss Centers, Inc. ("LAWL") for wrongful discharge in violation of New Jersey public policy, as first recognized by the New Jersey Supreme Court in <u>Pierce v. Ortho Pharmaceutical Corp.</u>, 84 N.J. 58 (1980). Delgado alleges that LAWL terminated her employment either in retaliation for exercising her statutory rights to benefits pursuant to the Temporary Disability Benefits Law ("TDBL"), <u>N.J.S.A.</u> § 43:21-25 *et seq*, or in an attempt to avoid its obligation to pay such temporary benefits. LAWL moves for summary judgment. For the reasons expressed herein, LAWL's motion is denied.

## I.     BACKGROUND

LAWL is a company that offers weight reduction plans and coaching to clients in more than 650 weight loss centers nationwide.  Delgado began her employment with LAWL on August 12, 2002 as a weight loss counselor at its Matawan, New Jersey Center (the "Matawan Center").  It is undisputed that Delgado was an at-will employee whose terms, conditions, and existence of employment could be changed at any time by LAWL for any reason, with or without prior notice.

In November 2002, Delgado was promoted to the position of manager of the Woodbridge, New Jersey Center (the "Woodbridge Center").  There is evidence not presently disputed by LAWL that under her management, the Woodbridge Center's revenue increased, and as a result of her hard work at the Woodbridge Center, Delgado won an award for Most Improved Store.

During her seven months as manager of the Woodbridge Center, Delgado had several different supervisors, including Jennifer Dowell, Marion Leone, and Sheryl Reynolds.  Ms. Reynolds stated in her Certification that "Ms. Delgado was an extremely hard worker and was very dedicated to L.A. Weight Loss and her clients. On one particular occasion, I recall her insisting on being at work two (2) days after she had gallbladder surgery."  (Certificate of David Zatuchni, Esq., Ex. K.) That surgery took place in April 2003.

2

Sometime around June 2003, Stephanie Rose ("Rose") became Delgado's new Area Supervisor.  At about that same time, Delgado requested and received a transfer to the Edison, New Jersey Center (the "Edison Center").  The Edison Center was within Rose's supervisory territory.  Because of staffing shortages, Delgado continued to assist with the Woodbridge Center and commuted between the Woodbridge and Edison facilities on a regular basis.

Delgado claims that her professional relationship with Rose was contentious and caused her great stress and anxiety.  Delgado contends that Rose made petty, critical, and demeaning remarks on a regular basis, and that these remarks caused her to become physically ill with diarrhea and stomach pain, as well as to suffer anxiety, mental pain and suffering, humiliation and embarrassment.  Delgado's co-workers testified that Delgado was often observed crying at work.  Delgado confided in a co-worker that she wanted to see a doctor because she was not feeling well; another co-worker noticed a drop in Delgado's weight, presumably resulting from her stressful environment and physical ailments.

On July 25, 2003, Delgado arrived at the Edison Center for work, but she claims she felt unwell.  Delgado testified at her deposition that she had several phone conversations with Rose throughout the morning and early afternoon concerning various matters, including her sickness.  During one such conversation, Rose

3

informed Delgado that she was going to be moved back to the Woodbridge Center as Manager.  LAWL states that during this conversation, "Rose informed Delgado that she was going to be reassigned back to the Woodbridge Center because she was not 'pulling the numbers,' or maintaining acceptable sales figures, at the Edison Center." (Defendant's Statement of Undisputed Facts, ¶ 32.)  At her deposition, Delgado testified about her reaction to the news of her impending transfer:

> I asked her why.  And she said because Diane [Rizzio] wants it that way.  And I said, really?  I want to hear it from Diane.  And she said, no, you can't hear it from Diane.  Diane asked me to tell you.  And I said, Stephanie, I don't understand why.  What did I do wrong?  And she said, you're not pulling the numbers.  And I said, don't you think it's been a little hard on me, Stephanie, to pull the numbers, running two stores, that number one store I'm not getting paid for.  Over here, the number two store, I have no employees.  So how can you guys come to that determination when I have no help?  I said, Stephanie, I am sick today, I am not feeling well, and I need to go home.

(Zatuchni Cert., Ex. C at 151:15-18.)  In LAWL's Statement of Undisputed Facts, LAWL described Delgado's conversation with Rose in ¶ 34 as follows:  "Delgado says that she was not feeling well that day and attempted to discuss her need to leave work with Rose, who did not have time to speak with her about it but promised to call her back."  (Def.'s Statement of Undisputed Facts, ¶ 34.)

I pause here momentarily to declare my displeasure with the presentation of

LAWL's ¶ 34 in its Statement of Undisputed Facts.  Local Civil Rule 56.1 states, "On motions for summary judgment, each side shall furnish a statement which sets forth material facts as to which there exists or does not exist a genuine issue."  The purpose of a " L. Civ. R. 56.1 Statement," as it is known, is to "narrow the issues before the District Court, and it has come to be relied upon by the Court as a vital procedural step."  L. Civ. R. 56.1 cmt. 2.

It is clear on its face that LAWL submitted a statement of <u>undisputed</u> facts.  As noted above, ¶ 34 states "Delgado *says* that she was not feeling well that day and attempted to discuss her need to leave work with Rose, who did not have time to speak with her about it but promised to call her back."  It is inconceivable that the Court should have to suffer the ambiguity caused by LAWL's use of the word "says" in this sentence, coupled with the structure of the sentence which suggestively relates "says" to each of three critical facts.  Webster's Dictionary defines the verb "say" as, *inter alia*, "(1) to utter aloud: speak; . . . (3) to state positively: declare; . . . (5) to report or maintain: allege."  WEBSTER'S II NEW RIVERSIDE UNIVERSITY DICTIONARY 1040 (1984).  Shall ¶ 34 therefore be read to mean that Delgado "alleges" certain facts – facts which by its word choice and sentence structure LAWL appears to dispute?  Or, in keeping with the "undisputed" nature of the Statement, shall ¶ 34 be interpreted as:  (1) it is undisputed that Delgado says (i.e., spoke aloud or declared)

she was not feeling well that day; (2) it is undisputed that Delgado attempted to discuss her need to leave work with Rose; and (3) it is undisputed that Rose did not have time to speak to her about it, but promised to call her back?  In keeping with the summary judgment standard, the Court concludes that this latter interpretation of ¶ 34 of LAWL's Statement of Undisputed Facts correctly accords Delgado all favorable inferences drawn from the evidence.

Continuing on, at her deposition, Delgado testified that she waited for Rose to call her back to no avail.  Finally, Delgado called Rose a second time.  Delgado claims Rose said, "Mary, I'm on the phone, I can't talk to you right now.  I'll call you back." (Zatuchni Cert., Ex. C at 151:19-22.)  According to Delgado, no such return call occurred.  After waiting an hour, at approximately 2:00 p.m., Delgado called Rose again to discuss her illness and her need to leave work.  Delgado testified that Rose said, "Mary, I really don't have time to talk to you."  (Id. Ex. C at 151:24 to 152:3.)  This time, according to her testimony, Delgado said, "Stephanie, I'm really sick and I'm leaving.  Okay.  I'm leaving Lori the keys to the store and I'm leaving.  All right.  I'll give you a call . . . you've got my cell phone number."  (Id., Ex. C at 152:3-7.)[1]  Here, LAWL states "Delgado alleges that she called Rose several times,

---

[1] Delgado testified that she also attempted to reach the Regional Manager, Diane Rizzio ("Rizzio"), after she left the Edison Center for home. Delgado asserts that she left a message for Rizzio at the Burlington LAWL Center to call

but has not produced any evidence to substantiate that claim other than her own testimony." (Def.'s Statement of Undisputed Facts, ¶ 35.)  At trial, the jury will hear Delgado's testimony and will weigh it accordingly.  For the purpose of this Motion, the Court views the evidence in the light most favorable to Delgado.

Delgado testified that after telling Rose she was leaving the Edison Center because she was sick, she "left the keys for Lori [Gilfoy], told her I was leaving, I wasn't feeling well and I left."  (Zatuchni Cert., Ex. C at 152:12-14.)  Delgado explained that she left her keys behind "because we only had one set of keys between the Woodbridge and Edison stores" (Id. at 152:9-12); therefore, Lori Gilfoy ("Gilfoy") would need the keys to close the Center at the end of the day.  (See id. at 119:16 -120:4.)

LAWL asserts two reasons for its decision to terminate Delgado's employment: "she abandoned her position without proper notice and even if she had not done so, she failed to comply with reporting in procedures for each day of her absence." (Def.'s Memorandum in Support of Summary Judgment 21.)  LAWL's employee handbook sets forth the following "Reporting In" procedure for the reporting of illness:

> If you expect to be late for work or are unable to

_____

her, but claims Rizzio never returned her call.

report for work because of illness or other unavoidable cause, you must *attempt to speak personally* via telephone with your immediate supervisor not less that (1) hour prior to your schedule starting time.  If you are going to be late for work, you are required to provide your supervisor a reason for and the expected length of your delay.  In the event you are unable to report for work, you must furnish your supervisor with the reason for and the expected duration of your absence.  If you are unable to speak personally with your supervisor, you must report your absence or lateness in accordance with the instructions established by your supervisor.

If your absence continues for more than one (1) day, you are required to contact your supervisor on a daily basis until the probable duration of your absence is established unless you provide a written statement from your health care provider indicating how long you are to be absent from work.  You will be expected to return to work on the stated date, unless you give your immediate supervisor a written change of return to work prepared by your health care provider which describes the reason for this change.

***

Your absence from work for a period of (2) consecutively-scheduled work days without properly reporting in constitutes an abandonment of your employment with the Company and is considered to be your voluntary resignation from our employ.

(Certification of Deena B. Beard, Esq., Ex. B) (emphasis added).  The record does not contain any instructions established by Rose in the event that an employee she supervised was unable to speak personally with her.  Furthermore, a fair reading of

8

this "Reporting In" procedure suggests that it does not even apply in the situation where an employee is already at work, but must leave because she is sick.

LAWL's employee handbook further provides specific "Sick Leave" procedures for reporting sick days:

> To qualify for paid Sick Leave benefits to cover an absence from work due to reasons described in this Policy, you must inform your supervisor in accordance with the procedures set forth in the Policy entitled Reporting In . . . .
>
> If you expect your absence to extend beyond one (1) day, you must continue to report in daily as discussed in Reporting In unless you provide your supervisor with a written statement form your health care provider indicating how long you are to be absent from work. . . . .
>
>  . . . [T]wo (2) episodes of unexcused absence not associated with an approved Leave of Absence which occur in any rolling twelve (12) month period may be grounds for discharge from our employ.
>
> LA Weight Loss Centers may require written certification from either your or your family member's health care provider or a health care provider designated by the Company as proof of your inability to work due to your own illness or injury . . . for:
>
> - All absences of three (3) consecutive work days or longer;
>
> - All unscheduled absences which fall on a Friday or a Monday . . . .
>
> Your failure to furnish a health care provider's

certification within seven (7) calendar days following the date on which the Company has requested such a certification will result in your forfeiture of paid Sick Leave.

(Beard Cert., Ex. B.)

Unbeknownst to Delgado, after she left the Edison Center on July 25, Rose completed an LAWL "Change Form" indicating to LAWL's payroll department that Delgado had quit her employment as of that very day. (Beard Cert., Ex. H.) Rose took this immediate action even though the employee handbook clearly states that LAWL considers a two-day absence without "reporting in" to be a voluntary resignation, and two episodes of unexcused absence to be grounds for discharge.

As noted above, one reason for terminating Delgado's employment, according to LAWL, was its belief that Delgado "abandoned her position without proper notice." (Def.'s Mem. Supp. Summ. J. 21.) LAWL attempts to explain Rose's seemingly hasty action by stating that "it is LAWL's policy that supervisors complete Change Forms and submit them to LAWL's payroll department contemporaneously with an employee's change in status." (Beard Cert., Ex. I at ¶ 5.) However, this explanation for Rose's action is wholly unsatisfactory because the very act of completing the Change Form meant that Rose knew Delgado left. If Rose knew Delgado was still at work, waiting to reach her to discuss her need to go home, Rose

10

would have no reason to believe that she quit, necessitating the filing of a Change Form.  If, on the other hand, Rose knew she left, there would be a partial reason to believe she quit (i.e., she is not at work and she gave her keys to Gilfoy), but the Court must credit Delgado's testimony in order for Rose to have that knowledge. Since Delgado's testimony is that she told Rose she was sick and had to go home, there is no basis for Rose's conclusion on July 25, 2003 that Delgado quit.  It is disingenuous to argue that Delgado abandoned her position without proper notice when Rose had to have known she left in order to fill out the Change Form.

To support its second argument that it terminated Delgado's employment because she "failed to comply with reporting in procedures for each day of her absence," (Def.'s Mem. Supp. Summ. J. 21), LAWL argues that Delgado's June 23, 2004 deposition testimony (quoted above at pages 4 and 6) must be disregarded because it differs from her interrogatory answers, dated April 1, 2004, and from an email she sent to customer service dated July 30, 2003.   In her answers to interrogatories, Delgado stated, "After speaking with Ms. Rose early that morning, Plaintiff attempted to reach Ms. Rose on several occasions before leaving on July 25, 2003.  On one such occasion when Plaintiff did manage to get Ms. Rose on the phone, Ms. Rose quickly stated to the Plaintiff that she did not have the time to talk to the Plaintiff and would call her back." (Zatuchni Cert., Ex. B at ¶ 12.)  This answer

11

is consistent with Delgado's deposition testimony, except that it does not reflect the statement in Delgado's deposition testimony that she told Rose that she was leaving work because she was sick.

In the July 30 email to the customer service department, Delgado wrote, "On Friday, July 25, 2003, I left LA Weight Loss without notice due to Area Supervisor, Stephanie Rose.  Please allow me to explain."  (Id., Ex. R.)  At Delgado's deposition she was questioned about this statement.  (Beard Cert., Ex. A at 185:7-24 to 186:1-3.) Delgado admitted the statement was true, but added that it was vague and required explanation.  (Id.)  The contents of the July 30 email describe Delgado's employment history with LAWL and her relationship with Rose.  Nowhere in the email does it state that she spoke to Rose on July 25, 2003 about going home sick, but the email states that "[a]s a result of Stephanie Rose, I am going out on temporary disability, due to stomach disorder."  It is clear that at least one purpose in sending this email was to alert LAWL of Delgado's illness.  Customer service confirmed receipt of this email on July 30, 2003, and it was forwarded to Human Resources.  (Zatuchni Cert., Ex.S, Ex. J at 65:16-20.)

Delgado's deposition testimony is somewhat more detailed than her prior answers to interrogatories and the July 30 email.  However, the deposition testimony, email, and answers to interrogatories are not contradictory in the sense prohibited by

Martin v. Merrell Dow Pharmaceuticals, Inc., 851 F.2d 703 (3d Cir. 1988) (affirming district court's decision to disregard plaintiff's affidavit which squarely contradicted earlier sworn statements and was submitted one year later in the face of almost certain defeat in summary judgment).  See also Farrell v. Planters Lifesavers Co., 206 F.3d 271, 284 (3d Cir. 2000).  Indeed, "subsequent correcting or clarifying [testimony] may be sufficient to create a material dispute of fact."  Martin, 851 F.2d at 705. Therefore, the Court will not preclude Delgado's testimony that she spoke to Rose on July 25, 2003 about her need to leave work due to her illness, though the jury may reject it because of the inconsistency.

Delgado presents additional evidence that controverts LAWL's argument that she failed to comply with reporting procedures on the days after July 25, 2003.[2]  On Saturday, July 26, 2003, Delgado was unable to return to work.  Delgado testified at her deposition that she left Rose a detailed phone message to say that she could not come to work because she was still sick, but Rose never returned her call.  (Zatuchni Cert., Ex. C 157:3-18.)  On Monday, July 28, 2003,[3] having received no return calls

---

[2] As with much of LAWL's Statement of Undisputed Facts, the evidence that Delgado presents in the ensuing discussion appears to be disputed by LAWL, or if it is not outrightly disputed, then LAWL suggests that Delgado's attempts to contact her supervisors were not sufficient–she should have made more attempts. See Def.'s Statement Undisputed Facts ¶¶ 40-50.

[3] LAWL is closed on Sundays.

13

from her supervisor or Diane Rizzio, the Regional Manager, Delgado attempted to reach Human Resources to explain her situation.  Delgado claims she called Nicki Fryer ("Fryer") three times during the course of that day, but was directed to voice mail on all three occasions.  According to Delgado, she did not leave messages regarding the substance of her call, but said she "needed to speak with [Fryer] regarding why I left work on Friday." (Zatuchni Cert., Ex. C at 162:6-24.)  Delgado testified that she did not receive any return calls from Fryer.  Fryer, on the other hand, denies having received multiple phone messages from Delgado on Monday, July 28, 2003; however, she admits that she received one voice mail message from Delgado on Tuesday, July 29, and that she did not return Delgado's call.  (Id., Ex. J at 31:20 to 33:10.)

On Tuesday, July 29, 2003 Delgado stayed home again.  Delgado testified that she contacted the Woodbridge Center and Rose answered the phone.  Delgado claims that when she identified herself, Rose immediately hung up the phone.  (Id., Ex.C at 164:7-14.)

Finally, on Wednesday, July 30, 2003, after repeatedly attempting to reach Rose, Rizzio, and Fryer, Delgado sent an email to LAWL customer service.  As noted above, Delgado stated in this email, "I am going out on temporary disability, due to

stomach disorder."[4]  (See discussion of the July 30 email *supra* at 11-12.)

It is clear that the employee handbook merely requires an attempt (see emphasized language at page 8) to speak personally to a supervisor.  There is evidence that Delgado repeatedly attempted to discuss her illness with Rose on July 25, 2003 before leaving LAWL.  There is also evidence that Delgado attempted to contact Rizzio after she left on July 25, and Rose and Fryer on subsequent days, but was unable to fully explain her reason for leaving, because Rose, Rizzio, and Fryer simply would not talk to her.  Accordingly, the Court finds that there is an issue of fact as to whether Delgado complied with LAWL's policy for the reporting of illness.

The next day, Thursday, July 31, 2003, Delgado saw her primary care physician, Sharon Ryan, M.D.  After conducting a physical examination, Dr. Ryan placed Delgado on temporary disability for the period extending from July 25, 2003 to August 18, 2003.  When Delgado returned home that day, she downloaded the temporary disability forms from the New Jersey Department of Labor ("NJDOL") website and faxed the documents to Michele Ruiz ("Ruiz") of LAWL's Human Resource department.

---

[4] LAWL points to Delgado's use of the past tense in the first sentence of this email, where she wrote "I was working for your company," as evidence that Delgado quit.  Defendant's argument is weak, is contradicted by other evidence, and does not meet the summary judgment standard.

Delgado testified that Ruiz telephoned her at home shortly after Delgado faxed her the disability forms. (Beard Cert., Ex. A at 193:14-17.) According to Delgado, during the conversation Ruiz called her a liar for filing for disability, said she was not sick, and told Delgado "she was fired." (Zatuchni Cert. Ex. C 182:11-16; 188:23-24 to 189:1-5; 190:20-24 to 191:1-9.) Delgado claims Ruiz also said "she was not going to fill out the paperwork" for her disability claim. (Id. at 182:21-22.) Ruiz denies the substance of this conversation, (Beard Cert., Ex. M at 60:3-13), although her own notes reflect that "[u]pon receipt of Ms. Delgado's paperwork she was advised that her disability paperwork would not be processed as she walked out of the center and did not make contact with her direct supervisors and was considered a voluntary quit." (Zatuchni Cert., Ex. DD.) Instead, Ruiz claims that when she spoke to Delgado she said she would fill out the paperwork according to what she learned from speaking with Rose about her last day at work; that is, that Delgado left work on July 25, 2003 without explanation, and did not return or contact her supervisor pursuant to LAWL's Reporting In requirement. (Beard Cert., Ex. M at 60:9-13.)

Ruiz testified that she received approximately twenty-five to thirty requests for temporary disability per week as part of her job as a benefits administrator for LAWL. (Beard Cert., Ex. M at 46:16-19.) As part of LAWL's filing procedure, Ruiz was required to investigate Delgado's "employment status for purposes of accurately

16

completing the temporary disability form." (Beard Cert., Ex. I at ¶ 9.)  According to

Karen Siegel, Senior Vice President of Human Resources for LAWL, Ruiz "informed

[her] that she had interviewed Rose and three other LAWL employees regarding the

circumstances of Delgado's leaving her employment on July 25, 2003 and confirmed

that Ms. Delgado walked off her job without notice."  (Id. ¶ 10.)

Regarding the interviews that Ruiz conducted, LAWL claims Ruiz obtained

written statements from co-workers, Gilfoy, Emelinda Owens ("Owens"), and Audra

Rephen ("Rephen"), indicating that Delgado quit her job at LAWL, that she hated

LAWL, and was taking a job with a granite company in Cranbury, New Jersey.  (See

Zatuchni Cert., Ex. X, Letter from Delgado to Michelle Ruiz of 8/4/03.)  However,

when Delgado confronted Gilfoy and Owens, both denied making any such

statements.  In a letter dated August 2, 2003, Gilfoy and Owens jointly wrote:

> To Whom it May Concern:
>      This is to act as a notice that neither I Emelinda
> Owens, or [sic] I Lori Gilfoy have had any oral
> conversation or written any letter in reference to our former
> Store Manager, Mary Delgado's work performance, or her
> feelings towards this Company.

(Zatuchni Cert., Ex. Z.)  Delgado received this letter from Gilfoy and Owens, and

faxed it to Ruiz on August 4, 2003.  (Id., Ex. X.)

On or about August 4, 2003, Rose called Gilfoy and Owens into her office,

17

where she questioned them about the letter they wrote for Delgado.  At her deposition, Owens testified that Rose asked to see the letter and when they showed it to her, Rose said, "This means nothing.  This is nothing."  Rose then tore up the letter and threw it in the garbage.  (Zatuchni Cert., Ex. E at 62:2-8.)[5]  According to Owens' testimony, Rose informed them that "we had to choose our allegiance, our loyalty either to the company or to Mary; and that if we did – [if] we chose our allegiance to Mary, that that would be considered insubordination, and that would be grounds for termination."  (Id., Ex. E at 62:18-25.)

Owens testified that Rose insisted that she and Gilfoy relate certain information about Delgado directly to Ruiz.  With Ruiz on the phone, and in Rose's presence, Owens told Ruiz that Mary had quit on July 25, 2003.  Gilfoy and Owens were then required to prepare letters memorializing that message.  On August 4, 2003, Gilfoy wrote:

> Attention Michelle,
> This is into [sic] reference of [sic] the situation, To my recollection I returned from my lunch break and Mary said I'm leaving and my keys are on my desk.

(Zatuchni Cert., Ex. AA.)  LAWL points to this letter as proof that Delgado quit when

---

[5] Gilfoy retrieved the pieces of the letter from the garbage after Rose left. The letter was taped together and is in the possession of Delgado's counsel.  A photocopy of the letter was provided in discovery.

she allegedly told Gilfoy, "I'm out of here" as she walked out of the center. (Beard Cert., Ex. M, Ruiz Dep. 87:23-25 to 88:1-3.) Gilfoy's letter does not say anything about Delgado quitting; neither does the letter state Delgado's reason for leaving – that she was ill. However, it comports with Delgado's testimony: "I left the keys for Lori, told her I was leaving, I wasn't feeling well and I left." (Zatuchni Cert., Ex. A at 152:12-14.) Although the letter is vague, it could be read to mean that Delgado did not quit, and on this record it does not support summary judgment for LAWL.

Owens submitted the following on August 6, 2003:

> At the request of the Director of Human Resources, I am submitting this letter. On the day of the week, July 25th 2003 I was working at the Avenel location, approximately at 3 pm I received a phone call from co-worker Lori Gilfoy informing me that Mrs. Mary Delgado had walked out and quit.

(Zatuchni Cert., Ex. BB.) Again that same day, Owens claims she was directed to provide more information to Ruiz about speaking with Delgado regarding the purported job at the granite company. (Id., Ex. CC; Ex. N.) She wrote:

> Attn: Michelle
>
> This statement is to confirm that on Mon. July 28th I had a telephone conversation with Mary Delgado in which she stated to me, Emelinda A. Owens, that she had found a new job for [sic] a granite company in Cranbury NJ. Mrs. Delgado had told me about the job because her new job location was near my residence. This was the entire extent of my conversation with Mrs. Delgado.

19

(Id., Ex. CC.)  At her deposition, however, Owens testified that she did not know whether Delgado had quit, that it was Rose who had told her that Delgado quit, not Gilfoy, and further that Rose instructed her to tell Ruiz that Delgado had quit.  (Id., Ex. E at 66-68.)  Owens also testified that the letter she submitted to Ruiz regarding the granite company job was completely false, and that she wrote it at Rose's demand. (Id. at 71-73.)

Similarly, Rephen described a situation in which Rose pressured her to submit information to the Human Resources department.  In her certification, Rephen states:

> Recently, I received a telephone call from the Area Supervisor, Stephanie Rose.  Stephanie contacted me with regard to a former Store Manager of L.A. Weight Loss, Mary Delgado.
>
> During this telephone conversation, Stephanie asked me to sign a statement indicating that Mary Delgado had quit L.A. Weight Loss.  I indicated to Stephanie that I could not sign such a statement because I was not present the day that Mary left work.  I work in East Brunswick and Mary was in the Edison Store on the day she left work. Stephanie replied, "just do it or I'll have Human Resources call you."  I still refused to sign the statement.
>
> Thereafter, Michelle Ruiz of Human Resources contacted me at work.  Ms. Ruiz explained to me that they were typing up a statement concerning Mary Delgado, indicating that Mary had quit L.A. Weight Loss and asked me if I would sign the typed statement.  Again, I explained that I was not comfortable signing such a statement.

20

> After my refusal to sign the statement, Stephanie continued to call me and harass me about signing this statement. . . . I never signed the statement.

(Zatuchni Cert., Ex. O at  ¶¶ 3-6.)

Ultimately, after some delay, Ruiz submitted the paperwork for Delgado's temporary disability claim, and Delgado received her benefits.  However, on September 4, 2003, Ruiz wrote to the NJDOL to appeal Delgado's award of benefits.  Her letter is telling.  It states:

> We respectfully request a relief from temporary disability for the above employee due to the fact that this employee voluntarily quit and walked out on Friday, July 25, 2003.  Ms. Delgado worked the entire week of the 21st, and was not temporarily disabled.
>
> Ms. Delgado has never informed LA Weight Loss Centers that she was ill and needed some time off.  Ms. Rose, Ms. Delgado's supervisor, indicated that she had a discussion with Ms. Delgado on July 25, 2003, concerning her job performance and the possibility of a demotion if there wasn't an improvement.
>
> When Ms. Rose left the center, Ms. Delgado waited for her coworker to return from lunch and told her, "I'm out of here, I quit." Ms. Delgado handed over her keys and walked out of the center before her shift had been completed.
>
> Ms. Delgado never made an effort to contact her supervisor or the human resource department to request a leave of absence.  As a matter of fact, over the weekend, Ms. Delgado contacted many of her coworkers to tell them

what happened on Friday, and encouraged her coworkers to do the same.  She also told them she had another job, which she was starting as of July 29, 2003.

Ms. Delgado contacted our office to request a leave of absence on July 29, 2003; and I informed her that due to the fact that she quit her job and walked out of her center, we considered her terminated.  Ms. Delgado claimed she was sick and needed to leave immediately and had been in the hospital over the weekend.  I explained to her that I've already spoken to her supervisor and her coworkers about the incident.  Ms. Delgado then applied for temporary disability, claiming she was out the entire week of the 21st, although she was at work.

LA Weight Loss Centers understands and respects the provisions of the law regarding temporary disability and can certainly appreciate the importance of providing claimants with timely decisions since this greatly affects the claimant's financial situation.

(Zatuchni Cert., Ex. GG.)

The factual allegations contained in this letter to the NJDOL not only clearly contradict those presented by Delgado and others, but appear in some instances to be totally unsupported by the record.  For example, there is no evidence in the record that Delgado solicited her co-workers to quit their jobs; no evidence that Delgado spent the weekend in the hospital; and no evidence that Delgado claims she was disabled for the entire week ending July 21, 2003.  As to this last point, the record reflects that all of the documents submitted to the NJDOL show a disability date of

22

either July 25, 2003 or July 26, 2003. (Zatuchni Cert., Exs. EE, FF, HH.)

## II.   STANDARD OF REVIEW

Summary judgment is appropriate if there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law.  Fed. R. Civ. P. 56; Serbin v. Bora Corp., 96 F.3d 66, 69 n.2 (3d Cir. 1996).  In evaluating a summary judgment motion, a court must "draw all reasonable inferences in favor of the non-moving party."  Armour v. County of Beaver, PA, 271 F.3d 417 (3d Cir. 2001) (quoting Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000)).  A motion for summary judgment requires the non-moving party to set forth specific facts showing that there is a genuine issue for trial.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986); Albright v. Virtue, 273 F.3d 564, 570 n.6 (3d Cir. 2001).  The burden of showing that no genuine issue of material fact exists rests initially on the moving party.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); Huang v. BP Amoco Corp., 271 F.3d 560, 564 (3d Cir. 2001).  Once the moving party has made a properly supported motion for summary judgment, the burden shifts to the non-moving party to "set forth specific facts showing that there is a genuine issue for trial."  Fed. R. Civ. P. 56(e); Anderson, 477 U.S. at 242.

The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment.  Matsushita

Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986); Quiroga v. Hasbro, Inc., 934 F.2d 497, 500 (3d Cir. 1991) (noting that a motion for summary judgment is not defeated by mere allegations, general denials, or other "vague statements"). Rather, only disputes regarding facts that might affect the outcome of the lawsuit under the governing law will preclude the entry of summary judgment.  Anderson, 477 U.S. at 247-48.  If the evidence is "such that a reasonable jury could return a verdict for the nonmoving party," summary judgment should not be granted.  Id. at 248; Lawrence v. Nat'l Westminster Bank of New Jersey, 98 F.3d 61, 65 (3d Cir. 1996).

## III.   **ANALYSIS**

### A.   Whether the TDBL Supports a *Pierce* Claim for Wrongful Discharge

Delgado brings a one-count claim for wrongful discharge against LAWL. While employed by LAWL, Delgado was an at-will employee.   New Jersey recognizes a claim for wrongful discharge of an at-will employee when the discharge violates a clear mandate of public policy.  Conoshenti v. Public Serv. Elec. & Gas Co., 364 F.3d 135, 148-89 (3d Cir. 2004) (citing Pierce v. Ortho Pharmaceutical Corp., 84 N.J. 58 (1980)). Sources of public policy include legislation, administrative rules, regulations or decisions, and judicial decisions.  Pierce, 84 N.J. at 72.  The existence of a clear mandate of public policy is a question of law.  Conoshenti, 364

24

F.3d at 149 (citations omitted).  Courts will only find that such a public policy exists if it is "clearly identified and firmly grounded . . . .  A vague, controversial, unsettled and otherwise problematic public policy does not constitute a clear mandate."  Id. Moreover, the offensive activity must pose a threat of public harm, not harm only to the plaintiff.  Id.

At the outset, LAWL argues that because no New Jersey court has addressed whether the TDBL sets forth a clear and precise statement of public policy sufficient to support a claim for wrongful discharge, the law is unsettled and therefore does not constitute a clear mandate.  The Court's research indicates that LAWL is correct. This issue is indeed one of first impression.  However, being an issue of first impression does not necessarily mean that the right involved here is based upon unsettled or unclear public policy; that is, policy unable to support a Pierce claim in this context.  Rather, by examining the TDBL, a clear policy emerges to extend protection against loss of earnings caused by involuntary unemployment to those employees who suffer earnings loss due to an inability to work caused by non-occupational sickness or accident.  N.J.S.A. § 43:21-26.  In providing benefits payments to replace wage loss under the TDBL, the legislature specifically acted to bridge a gap between occupational accident or illness, covered by the workers' compensation laws, and non-occupational accident or illness, previously uncovered,

"in order to maintain consumer purchasing power, relieve the serious menace to health, morals and welfare of the people caused by insecurity and the loss of earnings, to reduce the necessity for public relief of needy persons, and in the interest of the health, welfare and security of the people of this State . . . ." Id.

In a similar vein, New Jersey recognizes a common-law cause of action for wrongful discharge based upon retaliation for the filing of a workers' compensation claim. Lally v. Copygraphics, 85 N.J. 668, 670 (1981); Cerracchio v. Alden Leeds, Inc., 223 N.J. Super. 435, 442 (App. Div. 1988). Delgado argues persuasively that it would be irrational for employees with occupational injuries to be protected against retaliation for exercising their rights in seeking benefits, but not to be likewise protected for non-occupational injuries.

A cause of action for retaliatory wrongful discharge in this context complements the statutory objectives and the administrative policies which undergird the TDBL. See Cerracchio, 223 N.J. Super. at 442. Accordingly, the Court concludes that the public policy embodied in the TDBL is clear and precise enough to support Delgado's claim that she was wrongfully discharged for seeking temporary disability benefits.

B.    The Wrongful Discharge Claim

The McDonnell Douglas burden-shifting framework established by the federal

26

courts with respect to Title VII claims has been adopted by New Jersey courts with respect to retaliatory discharge claims. Morris v. Siemens Components, Inc., 928 F. Supp. 486, 493 (D.N.J. 1996). The elements of a *prima facie* case of retaliatory discharge brought under Pierce in this context are first, that plaintiff made or attempted to make a claim for temporary disability benefits, and second, that plaintiff was discharged for making that claim. Id. Establishing a *prima facie* case is not intended to be onerous. Watkins v. Nabisco Biscuit Co., 224 F. Supp. 2d 852,862 (D.N.J. 2002). "Defendant, as the moving party on the motion, bears the initial responsibility of demonstrating the absence of a genuine issue of material fact." Morris, 928 F. Supp. at 492.

Following the burden-shifting analysis of McDonnell Douglas, LAWL contends that Delgado cannot establish a *prima facie* case of retaliatory termination because she abandoned her job on July 25, 2003 and only later, on July 30 and 31, 2003, informed LAWL that she was filing for temporary disability benefits. LAWL also contends that even if Delgado is able to establish a *prima facie* case, there are legitimate, non-retaliatory reasons for Delgado's discharge; namely that Delgado was an at-will employee who failed to follow the company's prescribed policies for the reporting of illness. Finally, LAWL argues that Delgado is unable to establish the necessary "pretext" to survive its motion for summary judgment.

Delgado presents evidence that, on July 30, 2003, she emailed LAWL customer service saying that she was "going out on temporary disability." Delgado testified further that on July 31, 2003, she faxed Ruiz the temporary disability forms, and within a short time after receiving that fax, Ruiz telephoned her and allegedly told her she was fired. (Zatuchni Cert., Ex. C at 187:21-24 to 188:1-5; 190:20-24 to 191:1-10.) LAWL argues that Delgado quit her job on July 25, 2003, nearly a week before Delgado actually saw her physician or alerted LAWL of her intention to file for temporary disability benefits. The dispute regarding whether Delgado quit on July 25 or was fired as of July 31 is material and goes directly to the second prong of the *prima facie* case – the reason for the termination of her employment. LAWL has not met its burden of demonstrating that no genuine issue of material fact exists as to Delgado's *prima facie* case.

Assuming that Delgado can establish a *prima facie* case, LAWL must articulate a legitimate, non-retaliatory reason for her discharge. Once LAWL articulates such a reason, Delgado must produce sufficient evidence of pretext to rebut LAWL's asserted reason. Morris, 928 F. Supp. at 493.

Here, LAWL argues that its decision to terminate Delgado's at-will employment was legitimately and permissibly based upon her failure to comply with company procedures regarding the reporting of her illness. Although the Court does

28

not "sit as a super-personnel department that reexamines an entity's business decisions," Brewer v. Quaker State Oil Ref. Co., 72 F.3d 326, 332 (3d Cir. 1995), as previously discussed in this Memorandum, there are significant issues of fact involving those procedures and the way in which the procedures were implemented by LAWL that raise questions as to both the legitimacy of and the motivation for LAWL's actions.  See discussion *supra* at 10-15.

To further discredit LAWL's proffered reason for her termination, Delgado argues that LAWL did not follow its own policy (absence from work for two consecutive days without reporting in) in deeming her a "voluntary quit."  Delgado presents evidence that although she had repeatedly attempted to contact supervisors and human resource personnel to no avail, the first return call Delgado did receive, from Ruiz, came shortly after submitting her claim for temporary disability benefits. During this conversation with Ruiz, Delgado was informed that she was "fired." (Zatuchni Cert., Ex. C 190:20-24 to 191:1-9.)  Delgado points to evidence that Rose and Ruiz pressured other LAWL employees to make false statements about her to bolster LAWL's position that she quit her job.  This occurred after Ruiz received Delgado's temporary disability claim paperwork.  Finally, Delgado points to the letter Ruiz submitted to the NJDOL to appeal Delgado's award of temporary disability benefits which contained apparent falsehoods.   To prove pretext "a factfinder is

29

permitted to draw an inference of a guilty state of mind from a defendant's proffer of false evidence.  The extent of the falsity and the defendant's awareness thereof determine the strength of the negative inference." <u>Donofry v. Autotote Systems, Inc.</u>, 350 N.J. Super. 276, 292 (App. Div. 2001) (citing <u>Reeves v. Sanderson Plumbing Prods., Inc.</u>, 530 U.S. 133, 147 (2000)).  Considering the evidence presented by both Delgado and LAWL, the Court concludes that there are genuine issues of material fact in dispute as to the legitimate or pretextual basis for Delgado's termination.

The question of whether Delgado was fired under circumstances from which a fact finder could infer retaliation or whether Delgado quit her employment in advance of any notice to LAWL of her intent to file for temporary disability is a genuine and material factual dispute that is only properly resolved by a fact finder. Indeed, the Court is disturbed to note that there are so many questions of fact presented in this action that it is reasonable to assume someone is lying.  The Court is also troubled by the alleged attempt by LAWL to threaten other employees in order to get them to lie.  If this indeed happened, the Court must deal with that.

LAWL has not carried its burden at this stage to demonstrate the absence of a genuine issue of material fact, whereas Delgado has adduced evidence which, when considered in light of her burden of proof at trial, could be the basis for a jury finding in her favor.  Summary judgment is inappropriate.

Accordingly, **IT IS** on this 23rd day of March 2006

**ORDERED** that Defendant LA Weight Loss Center Inc.'s Motion for Summary Judgment is denied.

/s/ John C. Lifland, U.S.D.J.